Laurence D. King (SBN 206423)
lking@kaplanfox.com
Linda M. Fong (SBN 124232)
lfong@kaplanfox.com
Mario M. Choi (SBN 243409)
mchoi@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, Suite 400
San Francisco, CA  94104-1308
Telephone:  (415) 772-4700
Facsimile:   (415) 772-4707

Robert N. Kaplan (to be admitted *pro hac vice*)
rkaplan@kaplanfox.com
Frederic S. Fox (to be admitted *pro hac vice*)
ffox@kaplanfox.com
Donald R. Hall (to be admitted *pro hac vice*)
dhall@kaplanfox.com
Joshua H. Saltzman (to be admitted *pro hac vice*)
jsaltzman@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY  10022
Telephone:  (212) 687-1980
Facsimile:   (212) 687-7714

Marc A. Wites (to be admitted
 *pro hac vice*)
mwites@wklawyers.com
**WITES & KAPETAN, P.A.**
4400 North Federal Highway
Lighthouse Point, FL  33064
Telephone: (954) 570-8989
Facsimile:   (954) 354-0205

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JASON SCHWARTZ, SUZANNE BLOCK, KEVIN CALERO, CARLO CARINGAL, IAN CARSON, ANDRE CRUZ, LUCAS RANGEL FERREIRA, MASOOD JAVAHERIAN, DAVID KOPLOVITZ, BRIAN LETULLE, DEIRDRE MCELHANEY, CARMEN MINON, ERICA MINON, GABRIEL MINON, BETSY SANTIAGO, JAVIER SANTIAGO, and PETER YEE, <br><br> Plaintiffs, <br><br> v. <br><br> QUALCOMM INCORPORATED, <br><br> Defendant. | Case No. **'17CV166  GPC JMA** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE CONSUMER PROTECTION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT** <br><br> (Jury Trial Demanded) |

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ........................................................................ 1

JURISDICTION AND VENUE ................................................................... 2

THE PARTIES ............................................................................................. 3

AGENTS AND CO-CONSPIRATORS ....................................................... 6

FACTUAL BACKGROUND ....................................................................... 6

    I.      INDUSTRY BACKGROUND ........................................... 6

           A.    Cellular Technology ................................................ 6

           B.    Modem Chipsets ..................................................... 8

           C.    Standard Setting Organizations .............................. 8

    II.     QUALCOMM'S UNFAIR MONOPOLISTIC AND ANTI-COMPETITIVE PRACTICES ........................................... 11

           A.    Qualcomm's Market Dominance ............................ 11

           B.    Qualcomm's Use Of Its Mobile Chipset Market Dominance To Extract Unfair Patent License Fees And Terms ...................................................... 13

           C.    Qualcomm's Monopolistic And Anticompetitive Conduct Causes End Customers To Pay Artificially Inflated Prices For Smartphones ..................................................... 17

           D.    Qualcomm's Agreement With Apple ...................... 18

    III.   LAWSUITS AND REGULATORY ACTIONS AGAINST QUALCOMM ................................................................. 19

    IV.  THE ANTICOMPETITIVE EFFECTS OF THE DEFENDANTS' ANTITRUST VIOLATIONS .................. 22

    V.    MARKET DEFINITION ................................................. 23

CLASS ACTION ALLEGATIONS ............................................................. 23

CLAIMS FOR RELIEF ............................................................................... 37

    FIRST CLAIM FOR RELIEF: Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ................................. 37

    SECOND CLAIM FOR RELIEF: Nationwide Claim for Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.* ........ 39

CLASS ACTION COMPLAINT

1

**TABLE OF CONTENTS - cont'd**

2

**Page**

THIRD CLAIM FOR RELIEF:  Nationwide Claim for Violation
of Unfair Competition Law, Cal. Bus. & Prof. Code
§§ 17200, *et seq.* .................................................................. 40

FOURTH CLAIM FOR RELIEF: Violations Of State Antitrust
And Restraint Of Trade Laws ............................................... 41

FIFTH CLAIM FOR RELIEF: Violations Of State Consumer
Protection Statutes ................................................................ 54

SIXTH CLAIM FOR RELIEF: Unjust Enrichment ..................................... 62

PRAYER FOR RELIEF ............................................................................... 63

JURY TRIAL DEMANDED ......................................................................... 64

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs, on behalf of themselves and all others similarly situated (the "Classes" as defined below), bring this class action for damages and other relief pursuant to the federal and state antitrust laws, state consumer protection laws, and state common law, and demand a trial by jury.

**NATURE OF THE ACTION**

1.    This is a proposed class action against Qualcomm Incorporated ("Qualcomm" or "Defendant") for monopolization of the market for modem chipsets – used in smartphones and other devices that communicate over cellular networks – and for unfair use of its dominance in that market and in the market for certain mobile phone-related patents that Qualcomm owns – in violation of federal and state antitrust and unfair competition laws.

2.    Qualcomm is the dominant player in the market for modem chipsets – processors that enable "smartphones" – such as Apple's iPhone and Samsung's Galaxy line of products – as well as other cellular devices to communicate via cellular networks.  Qualcomm is also the dominant player in certain key types of patents used in smartphones and other cellular devices.

3.    Over the past decade, Qualcomm has used its dominance over these two markets in tandem to force unfair licensing terms and exorbitant royalties onto mobile handset Original Equipment Manufacturers ("OEMs"), which have virtually no choice but to rely on Qualcomm's technology.  Specifically, Qualcomm (1) uses anticompetitive measures to maintain its mobile chipset monopoly, such as denying patent licenses to competitor chipset manufacturers; (2) engages in a "no license-no chips" policy, *i.e.*, refusing to supply necessary chipsets to OEMs unless they agree to license Qualcomm's necessary patents on Qualcomm's terms; and (3) insists on unreasonable licensing terms, such as royalty rates many times the value of the patents and licensing of entire "portfolios" of patents (some of which the OEM may not need).

4.     Qualcomm's monopolistic and anticompetitive conduct has enabled it to consistently collect a royalty of 3-5% of the wholesale price of every mobile handset that uses its technology.  These royalties are many times higher than they would otherwise be based solely on the value of the underlying patents, and further, inflate the cost of mobile handset production.  This has led to Plaintiffs and the members of the prospective Classes paying inflated prices for smartphones.

5.     Qualcomm's monopolistic and unlawful conduct has resulted in numerous investigations by United States and international antitrust and trade authorities, and has caused it to incur billions of dollars in fines and sanctions to date.  For example, on September 9, 2009, the Japanese Fair Trade Commission ("JFTC") issued a cease-and-desist order against Qualcomm's conduct in violation of its obligations to license its essential patents on fair terms.  On February 10, 2015, the Chinese National Development & Reform Commission ("NDRC") fined Qualcomm $975 million for violations of the country's anti-monopoly law.  On December 21, 2016, The Korea Fair Trade Commission ("KFTC") fined Qualcomm $854 million for monopolistic and anticompetitive conduct with respect to its patent licensing.  And on January 17, 2017, the United States Federal Trade Commission filed an enforcement action against Qualcomm for its monopolistic and anticompetitive conduct.  *Federal Trade Commission v. Qualcomm, Inc.*, Case No. 17-cv-00220 (N.D. Cal. Jan. 17, 2017).

6.     Plaintiffs therefore bring this action on behalf of themselves and the prospective Classes (defined below) for damages stemming from Qualcomm's conduct in violation of Section 2 of the Sherman Act, state antitrust and consumer protection laws, as well as for injunctive relief and for any other available legal or equitable remedies the Court deems appropriate.

## JURISDICTION AND VENUE

7.     Plaintiffs bring this action under Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, against Defendant for the injuries that Plaintiffs and the

other members of the Classes have suffered from Defendant's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Plaintiffs also bring claims under state laws as set forth herein. The Court has supplemental jurisdiction over these pendant state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367.

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as this action arises under the federal antitrust laws.

9.    Venue is proper in this District under 28 U.S.C. § 1391(b), (c) and (d) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 because during the class period Defendant resided, transacted business, was found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

10.    This Court has personal jurisdiction over Qualcomm because Qualcomm maintains its principal place of business in this District.  In addition, this Court has personal jurisdiction over Qualcomm because it (a) transacted business throughout this District; (b) sold its modem chipsets and licensed its relevant patents in this District; (c) had substantial contacts with this District; and/or (d) committed one or more overt acts in furtherance of its monopolistic and anti-competitive scheme in the United States, including in this District.  In addition, the conduct alleged below was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

11.    Plaintiff Jason Schwartz is a resident of Miromar Lakes, Florida. During the Class Period, Jason Schwartz purchased a total of five Apple iPhones for himself and his family members for personal and/or business use, and not for resale, including two iPhone 7 Plus, two iPhone 7 and one iPhone 5s.

12.    Plaintiff Suzanne Block is a resident of Fort Lauderdale, Florida. During the Class Period, Suzanne Block purchased an iPhone 6 for personal use and not for resale.

13.    Plaintiff Kevin Calero is a resident of West Hollywood, Florida. During the Class Period, Kevin Calero purchased a Samsung Galaxy Edge 6 for personal use and not for resale.

14.    Plaintiff Carlo Caringal is a resident of Astoria, New York.  During the Class Period, Carlo Caringal purchased an iPhone 7 for personal use and not for resale.

15.    Plaintiff Ian Carson is a resident of Camp Pendleton, California. During the Class Period, Ian Carson purchased a Samsung Galaxy S5 for personal use and not for resale.

16.    Plaintiff Andre Cruz is a resident of Coconut Creek, Florida.  During the Class Period, Andre Cruz purchased an iPhone 5s for personal use and not for resale.

17.    Plaintiff Lucas Rangel Ferreira is a resident of Camp Pendleton, California.  During the Class Period, Lucas Rangel Ferreira purchased an iPhone 6 for personal use and not for resale.

18.    Masood Javaherian is a resident of Boca Raton, Florida.  During the Class Period, Masood Javaherian purchased a Samsung Galaxy S5 for personal use and not for resale.

19.    Plaintiff David Koplovitz is a resident of Coral Springs, Florida. During the Class Period he purchased or leased a total of nine Apple iPhones of various models for his own and his family members' personal and/or business use, and not for resale.

20.    Plaintiff Brian LeTulle is a resident of Fort Lauderdale, Florida. During the Class Period, Brian LeTulle purchased an iPhone 5s for personal and/or business use and not for resale.

21.    Plaintiff Deirdre McElhaney is a resident of Iselin, New Jersey. During the Class Period, Deirdre McElhaney purchased an iPhone 6 for personal use and not for resale.

22.    Plaintiff Gabriel Minon is a resident of Lauderhill, Florida. During the Class Period, Gabriel Minon purchased an iPhone 7 Plus for personal use and not for resale.

23.    Plaintiff Erica Minon is a resident of Maspeth, New York. During the Class Period, Erica Minon purchased an iPhone 6s Plus for personal and business use and not for resale.

24.    Plaintiff Carmen Minon is a resident of Maspeth, New York. During the Class Period, Carmen Minon purchased an iPhone 6 for personal and/or business use and not for resale.

25.    Plaintiff Betsy Santiago is a resident of Lake Worth, Florida. During the Class Period, Betsy Santiago purchased a Samsung smartphone for personal use and not for resale.

26.    Plaintiff Javier Santiago is a resident of Lake Worth, Florida. During the Class Period, Javier Santiago purchased a Samsung Galaxy S7 for personal use and not for resale.

27.    Plaintiff Peter Yee is a resident of Elmhurst, NY. During the Class Period, PeterYee purchased an iPhone 6s Plus for personal and/or business use and not for resale.

28.    The plaintiffs named in paragraphs 11-27 above are collectively referred to as "Plaintiffs."

29.    Defendant Qualcomm is a Delaware Corporation with its principal place of business in San Diego, California. Qualcomm does business primarily through two business units: Qualcomm CDMA Technologies ("QCT"), which develops and supplies integrated circuits and software based on CDMA (explained below), and Qualcomm Technology Licensing ("QTL"), which licenses

Qualcomm's numerous patents.  Qualcomm, through QCT, dominates the market for modem chipsets (also known as baseband processors) used by modern smartphones to communicate with cellular networks.  Additionally, Qualcomm, through QTL, dominates the market for many of the types of patents needed for smartphones to communicate with cellular networks.

## AGENTS AND CO-CONSPIRATORS

30.    The acts of Defendant alleged in this Complaint were authorized, ordered, or committed by its officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendant's businesses or affairs.

31.    Various persons or firms not named as defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## FACTUAL BACKGROUND

I.    **INDUSTRY BACKGROUND**

A.    **Cellular Technology**

32.     Mobile phones transmit and receive data and voice wirelessly over networks set up by carriers such as Verizon, AT&T, T-Mobile and Sprint.  In order to do so, the phones must contain certain standardized technology to be compatible with some or all of the available networks.

33.    The technology and standardized protocols underlying mobile phones' ability to transmit and receive voice and data wirelessly are commonly described in "generations" or "G"s.  Cellular networks such as Verizon, AT&T, T-Mobile and Sprint build their networks to comply with these protocols, and makers of mobile phones and other devices that utilize those networks must build their devices to be compatible with those networks.

34.    First Generation ("1G") is the term retroactively applied to the first mobile telephones which transmitted analog signals.

35.    Second Generation ("2G") describes the technology in the first digital mobile phones.  2G supports digital transmission of voice as well as limited transmission of data over the Internet.  The two primary 2G standards families are Global System for Mobile Communications ("GSM") and second-generation Code Division Multiple Access ("2G-CDMA").

36.    Third Generation ("3G"), which became widespread in the late 1990s and early 2000s, describes the first standards that supported high-speed data transmission, thus making internet-capable smartphones practicable.  The primary 3G standards families are Universal Mobile Telecommunications Systems ("UMTS") – an extension of GSM – and 3G CDMA standards.  In the United States, carriers such as Sprint and Verizon operate 3G CDMA networks, while AT&T and T-Mobile operate GSM networks.

37.    Fourth Generation ("4G") describes standards that support higher transmission speeds than 3G.  The leading 4G standard is Long-Term Evolution ("LTE"), which numerous cellular networks now support in addition to their respective 3G standards.

38.    Mobile handsets are typically configured to be compatible with a particular carrier, and, as such, must have modem chipsets that enable the handsets to communicate with the carrier's network.  For example, a handset created for use with the Verizon network must be CDMA-compatible, while an AT&T phone must be GSM-compatible.  This means that GSM-compatible chipsets are not substitutes for CDMA-compatible chipsets.

39.    Although 4G standards are now dominant in high-end or premium smartphones, 3G networks are still in widespread use, and many carriers operate both 4G and 3G networks simultaneously.  Most LTE-compatible smartphones are thus manufactured to be backwards-compatible with 3G networks, and thus require modem chipsets that work seamlessly with both standards.

CLASS ACTION COMPLAINT

40.    Today's internet-capable "smartphones," such as Apple's iPhone and Samsung's Galaxy handsets, are used for a wide variety of data-intensive communication functions, including global positioning system (GPS) directions and streaming video over the internet.  To function properly, they must contain processors that allow them to seamlessly integrate with high-speed LTE networks.

### B.    Modem Chipsets

41.    Modem chipsets (also referred to as "baseband processors" or "baseband chipsets") handle the functions of mobile handsets and other devices that are directed through antennas to cellular networks; the modem chipset enables the device to communicate with and transmit and receive information over a cellular network.

42.    Modern smartphones typically require modem chipsets that are compatible with both 4G and earlier network standards, or "multimode" chipsets. 4G standards like LTE are typically designed for data, and thus smartphones may use earlier standards to transmit and receive voice.  Further, 4G network infrastructure does not yet exist in all places, and thus smartphones must be able to communicate via 3G networks where 4G networks are unavailable.

### C.    Standard Setting Organizations

43.    Because a variety of makes and models of smartphones and other mobile handsets must be able to function across various mobile networks maintained by different cellular carriers, both the mobile handset industry and the network industry rely on Standard Setting Organizations ("SSOs") to help ensure that devices and networks are compatible and interoperable.  A wide variety of smartphones, tablets and other devices must be able to transmit and receive data and voice over the same network equipment in a seamless manner, requiring cooperation among industry players via SSOs.  The SSOs impacting the cellular network industry, the chipset industry, and the mobile handset industry include the European Telecommunications Standard Institute ("ETSI"), the Third Generation

Partnership Program ("3GPP"), the International Telecommunications Union ("ITU"), and the Institute of Electrical and Electronic Engineers ("IEEE").

44.     In order to ensure that networks, network equipment, handsets and components from a variety of carriers and manufacturers are all compatible with one another, SSOs create technical standards and specifications.  This includes selecting certain patented technologies that will become the standard for a particular function – Standard Essential Patents ("SEPs").

45.     While SEPs are necessary for smoothly functioning markets in cellular technology, they also pose market problems.  Because other market participants are locked into a certain standard, an SEP holder can use its market power from its legally sanctioned monopoly on a necessary patent, to extract unreasonable licensing royalties and/or terms, as all market participants require use of those SEPs to meet the standard.  This phenomenon is sometimes referred to as "patent hold-up."

46.     Additionally, in advanced technologies like cellular networks and mobile handsets where many patents can be implicated by a single standard, the resulting royalty payments often "stack" on top of one another and can contribute substantial costs to the total price of a device, which are then passed on to the consumer.  As one expert explained:

> The data show that royalty stacking is not merely a theoretical concern.  Indeed, . . . we estimate potential patent royalties in excess of $120 on a hypothetical $400 smartphone—which is almost equal to the cost of device's components.  Thus, the smartphone royalty stack across standardized and non-standardized technology is significant, and those costs may be undermining industry profitability—and, in turn, diminishing incentives to invest and compete.[1]

---

[1] Joseph J. Mueller & Timothy D. Syrett, *The Smartphone Royalty Stack: Surveying Royalty Demands for the Components within Modern Smartphones* (May 29, 2014), available at https://www.wilmerhale.com/pages/publicationsandnewsdetail.aspx?NewsPubId=17179872441.

CLASS ACTION COMPLAINT

47.     To help alleviate the problems of "patent hold-up" and "royalty stacking," SSOs require licensing of SEPs on Fair, Reasonable and Non-Discriminatory ("FRAND") terms.  The right to patent licensing on FRAND terms is typically created by agreements between SSOs and their members; some SSOs require their members to agree to by-laws requiring them to abide by FRAND terms, while others require SEP holders to execute agreements with the SSOs requiring them to abide by FRAND terms.

48.     Courts have typically enforced FRAND terms in disputes between SSO members on the theory that plaintiff corporations are third-party beneficiaries of contracts between the patent holders and the SSOs.[2]

49.     The Third Circuit explained the rationale behind enforceable FRAND commitments as follows:

> A standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard. Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's IPRs, if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007).

---

[2] *See*, *e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash. 2012) ("Microsoft, as a member of both the IEEE and the ITU, is a third-party beneficiary of Motorola's commitments to the IEEE and ITU." (citation omitted)); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wash 2012) ("As a potential user of the standards at issue and a perspective licensee of the essential patents, Apple is a third-party beneficiary of the agreements between Motorola and IEEE and Motorola and ETSI.").

## II.   QUALCOMM'S UNFAIR MONOPOLISTIC AND ANTI-COMPETITIVE PRACTICES

### A.   Qualcomm's Market Dominance

50.     Qualcomm has long been the dominant player in the markets for modem chipsets needed to communicate with CDMA and LTE networks.  The table below[3] illustrates Qualcomm's approximate market share in modem chipsets for each of three standards – LTE, CDMA and WCDMA:

|       | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|-------|---------|---------|---------|---------|---------|---------|---------|---------|
| LTE   | -       | -       | 34.2%   | 58.8%   | 94.5%   | 96.0%   | 84.8%   | 69.4%   |
| CDMA  | 98.4%   | 97.6%   | 96.4%   | 94.3%   | 92.4%   | 93.1%   | 91.6%   | 83.1%   |
| WCDMA | 38.8%   | 47.4%   | 45.7%   | 55.0%   | 50.4%   | 53.9%   | 48.8%   | 32.3%   |

* Source: Strategy Analytics

As these numbers show, Qualcomm has had a monopoly on LTE modem chipsets since at least 2012, and on CDMA chipsets since at least 2008.  Further, Qualcomm is the dominant player in multimode chipsets, which are compatible with both LTE and CDMA.

51.     Qualcomm also played an essential role in developing the technologies used in CDMA-compatible mobile phones, and developed many important patents required by LTE-compatible mobile phones as well.  Consequently, Qualcomm holds many Standard-Essential Patents ("SEPs") – *i.e.*, patents that are essential for mobile handsets to comply with network standards.

52.     Qualcomm's SEP dominance combined with its monopoly in modem chipsets gives it enormous market power.  As a research report published by Morningstar on January 21, 2015 observed:

> Qualcomm is the innovator of CDMA network technology, the backbone of all 3G networks, and we view its CDMA intellectual property portfolio as the source of its wide economic moat. Essentially, phones are unable to connect

---

[3] Taken from KFTC issued press release dated December 28, 2016–unofficial English translation ("KFTC Release"), available at https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation

to 3G networks without paying a royalty (about 3%-5% of the price of the handset) to the company.

53.     While Qualcomm "doesn't have the same dominant IP portfolio in 4G technologies like LTE," the research report continues, Qualcomm nonetheless "has generated enough essential patents to enable it to strike new deals with many large handset makers."  Further, the report notes, Qualcomm's dominance in 3G patents and multimode processors (processors that are compatible with both 4G and 3G networks) enable it to extract inflated royalty rates from 4G handsets, since most such handsets are backward-compatible with 3G networks, and thus require Qualcomm's 3G SEPs.  Consequently, Morningstar predicted that Qualcomm would only earn about 5% lower royalties on 4G versus 3G handsets, and that Qualcomm would "earn healthy royalty revenue at over 85% operating margins well into the future."

54.     Qualcomm's market dominance is furthered by high barriers to entry. Developing a commercially viable chipset requires an extensive R&D program and complex engineering work, an investment of years and potentially hundreds of millions or billions of dollars.  And, precisely because of the standards-oriented nature of cellular network technology, chipset manufacturers must obtain certification of cellular network operators for use on their networks, another significant barrier to entry.

55.     As a result of Qualcomm's conduct, it has no competition in the market for multimode LTE chipsets with CDMA compatibility, and little competition in the market for LTE-compatible chipsets.

/ / /

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT

56.     As illustrated below, the vast majority of Qualcomm's profits come from its patent licensing royalties, and the disparity has only grown with time:



**Qualcomm's Licensing Profit Takes Off**
Chipmaker's profits increasingly depend on patent income

■ Licensing Profit  ■ Chip Unit Profit

Source: Bloomberg data

Bloomberg

57.     In total, Qualcomm has earned more than $50 billion in patent licensing revenue since 2000, and earns licensing royalties on nearly every smartphone sold, including smartphones that do not use Qualcomm's chipsets.

**B.     Qualcomm's Use Of Its Mobile Chipset Market Dominance To Extract Unfair Patent License Fees And Terms**

58.     Unfairly, and in violation of federal and state antitrust and unfair competition laws, Qualcomm uses its dominance in the modem chipset and intellectual property markets (as set forth herein) in combination with each other to extract exorbitant licensing fees and unfair licensing terms from mobile handset makers.  Qualcomm does this using three forms of unfair and anticompetitive conduct in combination with one another:

59.     **First**, Qualcomm either refuses to license its mobile chipset-related patents to competitors, or licenses them on extremely restricted terms.  This helps

to maintain Qualcomm's monopoly in the mobile chipset market by preventing competitors from being able to produce and market comparable chipset products.

60.    **Second**, Qualcomm holds its customers – primarily mobile handset OEMs – to a "no-license-no-chips" policy.  This means that, to purchase mobile chipsets from Qualcomm, a mobile handset manufacturer must agree to Qualcomm's unilateral license terms and fees.  Qualcomm often incorporates this policy into its supply agreements with manufacturers, inserting clauses that allow Qualcomm to refuse or stop the supply of chipsets when handset companies do not comply with Qualcomm's licensing terms.

61.    **Third**, Qualcomm insists that OEMs agree to unreasonable terms, such as requiring OEMs to license its entire portfolio of patents (some of which the OEM may not need) and requires manufacturers to license their own patents for free to Qualcomm for Qualcomm's use.  Qualcomm further requires manufacturers to pay many times higher licensing royalties than they would otherwise pay on the patents.

62.    The Korea Fair Trade Commission illustrated the conduct with the following graphic:



63.    Each aspect of Qualcomm's conduct helps to reinforce the other, in turn creating a holistic business model based on unfair and monopolistic conduct. Qualcomm's conduct helps to maintain its dominance in the chipset market and prevents manufacturers from negotiating fair terms for patent licenses, as well as in some cases, forcing OEMs to license patents they do not need or use as part of "patent portfolios."

64.    Qualcomm's refusal to license its SEPs to competitor chipset makers has contributed to a gradual exit from the chipset market, furthering Qualcomm's ultimate dominance. Although the size of the overall market for modem chipsets has doubled since 2008, Qualcomm's refusal to license its SEPs combined with its other anti-competitive practices has helped to cause the number of major players in the chipset market to dwindle from 11 to just 2 in 2016.

65.    Qualcomm's use of its market dominance to unilaterally insist on unfair SEP license royalties and terms violates its obligation to SSOs – and, in turn, to OEM third-party beneficiaries – to license its patents on FRAND terms and at FRAND rates.

66.    Analysts estimate that Qualcomm earns 3-5% of the *total wholesale price of each smartphone sold* in patent royalties. This means that Qualcomm may be collecting as much as $45 in SEP royalties per smartphone sold, even though the value Qualcomm's patents contribute to the phone are likely a small fraction of that amount.

67.    Qualcomm's practice of charging a percentage of the entire unit wholesale price – rather than a percentage of the relevant component price – contributes to this unfair and inflated revenue. Indeed, in February 2015, the IEEE – one of the relevant SSOs – updated its licensing policy to clarify that an SEP should be licensed for a rate reflecting the actual value it contributes to a product. Among the factors in this determination is the value the patent contributes

to the *smallest salable component* of the overall product that relies on the patent, rather than the value of the entire product.[4]

68.    The unfairness of Qualcomm's SEP royalty rates is also evidenced by a number of other factors, including:  (1) the fact that the royalties Qualcomm collects on each unit are several times higher than royalties collected by other SEP licensors who have made similar contributions;[5] (2) the lack of change in Qualcomm's royalty as a percentage of the total handset price, even as the handsets grow to include other value-contributing features such as advanced cameras, high-resolution displays and advanced processors that have nothing to do with Qualcomm's contributions; (3) the fact that Qualcomm has not lowered its royalty rates even as some of its patents have expired; and (4) the fact that, while Qualcomm requires licensees to grant cross-licenses of their own patents to Qualcomm, it has never adjusted its royalty rate to account for the value of those cross-licenses.

69.    Patent licensees often challenge non-FRAND licensing of SEPs in court.  Indeed, in many cases involving SEP royalty rates, courts have entered judgments determining FRAND rates to be far below the rates being charged.[6]

70.    Qualcomm's practices, however, strongly discourage OEMs from going to court to seek determinations of FRAND rates in the first place because Qualcomm's coercive "no-license-no-chips" policy means that OEMs risk losing access to a supply of Qualcomm's essential modem chipsets as retaliation for attempting to challenge Qualcomm's SEP royalty rates.  Large OEMs typically

---

[4] Jorge L. Contreras, "IEEE Amends its Patent (FRAND) Policy," February 9, 2015, available at http://patentlyo.com/patent/2015/02/amends-patent-policy.html.

[5] Indeed, Apple alleges that it pays more to Qualcomm in patent royalties than to all other cellular patent holders combined.  *See* Apple Complaint (defined below) at ¶ 80.

[6] *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 2111217, at *99-101 (W.D. Wash. Apr. 25, 2013); *Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-3451, 2014 WL 2738226, at *6.

cannot afford such supply disruptions, even where they might theoretically prevail in court on a FRAND rate determination.

71.    In sum, Qualcomm uses its market dominance in chipsets to all but force OEMs to accept inflated prices for their SEP portfolios.  Qualcomm "use[s] the threat of terminating the supply of modem chipsets as negotiation leverage in the process of license negotiations with handset companies."[7]  This means that OEMs that refuse Qualcomm's terms "face the risk of their entire business shutting down."[8]

72.    There are no legitimate pro-competitive efficiencies that justify the conduct of Qualcomm, or that outweigh the anticompetitive effects of that conduct.

**C.    Qualcomm's Monopolistic And Anticompetitive Conduct Causes End Customers To Pay Artificially Inflated Prices For Smartphones**

73.    As a result of Qualcomm's monopolistic, unfair and anticompetitive conduct, OEMs pay artificially inflated prices for Qualcomm's chipsets and patents. OEMs are in turn forced to charge, and thus retail purchasers of smartphones and mobile handsets are required to pay, artificially inflated prices.

74.    Analysts estimate that Qualcomm earns SEP royalties of 3-5% of the total wholesale price of each smartphone sold as a result of its one-sided licensing agreements with OEMs.  With typical smartphone models wholesaling in the approximate range of $300-$900 per unit,[9] Qualcomm likely collects as much as

---

[7] *See* Yoonhee Kim & Hui-Jin Yang, *A Brief Overview of Qualcomm v. Korea Fair Trade Commission*, CPI Antitrust Chronical (Mar. 2015), available at https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf.

[8] *Id.*

[9] *See, e.g.,* Joshua Sherman, "*Spendy but indispensable: Breaking down the full $650 cost of the iPhone 5*," Digital Trends, available at http://www.digitaltrends.com/mobile/iphone-cost-what-apple-is-paying/ (estimating that Apple's markup on an iPhone retailing for $650 was $68.90, placing the wholesale cost at $581.09).  iPhone models currently on the market range from $399 for the least expensive version to $969 for the most expensive version.

$45 in patent royalties on each smartphone unit sold, *in addition* to its earnings from sales of modem chipsets to the OEMs. Qualcomm earns SEP licensing royalties on nearly every smartphone sold, including smartphones that do not use its chipsets.

75.     These royalty fees increase OEMs' total cost to manufacture and bring to market their smartphones; these costs are then passed on to consumers and thus inflate the retail prices consumers pay for smartphones.

### D.     Qualcomm's Agreement With Apple

76.     One example of Qualcomm's unfair use of its market power stems from its relationship with Apple, Inc. ("Apple").

77.     Apple is one of the dominant players in the mobile smartphone market. For example, in 2015, Apple sold 15-20% of the smartphones sold worldwide and over 40% of the smartphones sold in the United States.

78.     In spite of Apple's substantial market power, Qualcomm's monopoly on chipsets has allowed it to extract unfair and anticompetitive terms and fees from Apple.

79.     Apple differs from other handset manufacturers in that it does not directly license patents from Qualcomm because its relevant components are not manufactured by Apple but by third party manufacturers; Apple's third-party suppliers, rather than Apple itself, are licensees of Qualcomm's SEPs. Nonetheless, because the costs of these licenses are passed on to Apple by the contract manufacturers, Apple, like other OEMs, is impacted by Qualcomm's inflated royalty rates and unfair licensing terms.

80.     In order to reduce some of its royalty burden, Apple entered into agreements with Qualcomm in 2007, 2011, and 2013, respectively. While these agreements provided some monetary relief to Apple, they (1) locked Apple into unreasonable and unfair terms and (2) served to further Qualcomm's dominance of the chipset market.

81.     The 2007 agreement offered Apple a rebate on royalties Apple's third-party contract manufacturers paid to Qualcomm in exchange for an agreement not to sell or license a handset implementing the WiMax standard – the standard championed by Qualcomm competitor Intel.

82.     The 2011 agreement afforded Apple certain incentive payments through September 2016, but conditioned these payments on Apple exclusively using Qualcomm chipsets in all new iPhone and iPad models during that time.

83.     Finally, Qualcomm's 2013 agreement with Apple modified the 2011 agreement; among other things, it added a condition that Apple neither initiate nor induce others to initiate litigation claiming that Qualcomm had failed to offer a license on FRAND terms.

84.     These agreements had the effect of all but foreclosing Qualcomm's competitors from supplying chipsets to one of the dominant players in the smartphone market, thus helping to cement Qualcomm's dominance over the LTE market.

85.     Qualcomm's conduct with respect to Apple harms both Apple and Apple's competitor OEM's.  Consequently, this conduct also harms consumers of both Apple's cellular devices and its competitors' cellular devices.

### III.     LAWSUITS AND REGULATORY ACTIONS AGAINST QUALCOMM

86.     As of this filing, numerous regulatory actions and lawsuits have resulted from Qualcomm's monopolistic conduct, and Qualcomm has already paid billions of dollars in sanctions and fines for its unfair conduct.

87.     On February 9, 2015, U.S. press sources reported that China had fined Qualcomm $975 million for monopolistic and anticompetitive conduct similar to that described herein.[10]

_____

[10] *See*, *e.g.*, Don Clark, "*Qualcomm to Pay $975 Million Antitrust Fine to China*," The Wall Street Journal, February 9, 2015, available at *(footnote continues next page)*

88.     The Japan Fair Trade Commission began investigating Qualcomm in 2006, and in 2009 concluded that Qualcomm had violated the Japanese Antimonopoly Act by forcing OEMs to cross-license their patents royalty-free.

89.     On December 8, 2015, Qualcomm announced that the Taiwan Fair Trade Commission ("TFTC") was investigating whether the Company's patent licensing arrangements violate the Taiwan Fair Trade Act.

90.     On December 28, 2016, the KFTC announced that it had imposed a sanction of 1 trillion won ($1 billion U.S.) on Qualcomm – the largest in the KFTC's history – for its monopolistic and anti-competitive conduct with respect to its SEPs and modem chipsets.[11]  The KFTC Release describes Qualcomm as a "vertically integrated monopolistic enterprise" that uses its power to "coerc[e] unfair agreements" with OEMs in violation of its FRAND obligations.  The KFTC had previously fined Qualcomm $207 million for unfair and monopolistic practices relating to its dominance of the CDMA chipset market.

91.     In October 2014, the European Commission ("EC") notified Qualcomm of an investigation into its anti-competitive practices.  The EC issued two Statements of Objections against Qualcomm in December 2015, one of which alleged that Qualcomm's exclusivity agreement with "a major smartphone and tablet manufacturer" (presumably Apple) harmed chipset competition.[12]

92.     In November 2014, Qualcomm announced that the United States Federal Trade Commission ("FTC") had initiated a probe into Qualcomm's anti-competitive conduct.  On January 17, 2017, the FTC filed a complaint against

_____

(*footnote continued from prior page*)
http://www.wsj.com/articles/qualcomm-settles-china-probe-1423518143.

[11] KFTC issued press release dated December 28, 2016– unofficial English translation ("KFTC Release") available at https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation.

[12] Press Release, "Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm," European Commission (Dec. 8, 2015), available at http://europa.eu/rapid/press-release_IP-15-6271_en.htm

Qualcomm in the U.S. District Court for the Northern District of California alleging anticompetitive conduct in violation of the FTC Act. *Federal Trade Commission v. Qualcomm Inc.*, No. 5:17-cv-00220, Dct. No. 1 (the "FTC Complaint"). The FTC Complaint alleges, *inter alia*, that Qualcomm uses its dominance in the chipset market to prevent OEMs from challenging its FRAND-violative licensing terms, that Qualcomm refuses to license its SEPs to competitors, and that Qualcomm used its market power to extract an exclusivity agreement from Apple in exchange for partial royalty relief.

93.     On January 20, 2017, Apple filed a complaint against Qualcomm in the United States District Court for the Southern District of California alleging monopolization under the Sherman Act, violations of state unfair competition law, breach of contract, and seeking declarations of non-infringement relating to a number of Qualcomm's patents. *Apple Inc. v. Qualcomm Inc.*, No. 17-cv-0108-GPC-NLS ("Apple Complaint").

94.     The Apple Complaint includes allegations similar to those in the FTC Complaint and the KFTC Release regarding Qualcomm's unfair use of its chipset monopoly to extract non-FRAND licensing terms and royalties for its patents. In addition, the Apple Complaint alleges that Qualcomm takes advantage of Apple's position as an indirect rather than direct purchaser of Qualcomm's chipsets and patents to further extract unreasonable fees and terms. According to the Apple Complaint, Apple, unlike other OEMs, relies on third-party manufacturers to produce many of the components that use Qualcomm's patents, and thus does not enter into licensing agreements with Qualcomm. Taking advantage of this situation, Qualcomm enters into secret SEP licensing agreements with those third-party manufacturers, leaving Apple unaware of the costs, terms and contents of the patent portfolios being licensed. This enables Qualcomm to extract higher royalties as it knows that the third-party manufacturers will pass the costs onto Apple, and thus have no incentive to negotiate with Qualcomm. Apple Complaint, ¶¶ 73-76.

- 21 -

Further, Apple alleges that Qualcomm retaliated against Apple for cooperating with the FTC and other regulatory bodies' investigations of Qualcomm by withholding nearly $1 billion in rebates from Apple.  *Id.*, ¶¶ 176-205.

## IV.  THE ANTICOMPETITIVE EFFECTS OF THE DEFENDANTS' ANTITRUST VIOLATIONS

95.    The effects of Defendant's monopolistic, anticompetitive and exclusionary acts include artificially inflating the royalties paid for Qualcomm's SEPs, significantly raising barriers-to-entry for potential rivals in the modem chipset market, and unreasonably restraining trade in the relevant markets.

96.    Qualcomm's acts of monopolization of the modem chipset market and of certain types of SEPs constitutes illegal monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

97.    Defendant's conduct adversely affected competition and consumers by artificially inflating the cost of production of smartphones, which in turn increased the retail prices paid for those smartphones by consumers.

98.    There are no legitimate pro-competitive efficiencies that justify Qualcomm's conduct or that outweigh the substantial anticompetitive effects of that conduct.

99.    Absent Qualcomm's monopolistic conduct, Qualcomm would have faced additional competition from other chipset manufacturers, and would have faced more aggressive negotiation of patent licensing agreements by OEMs, both of which would have driven down the prices for Qualcomm's SEPs to competitive levels and, in turn, the costs of producing smartphones.  This would have led to lower retail prices for smartphones.

100.    Plaintiffs and members of the Classes have, as a consequence, sustained losses and damages in the form of the payment of inflated prices for smartphones containing Qualcomm chipsets and SEPs.  The full amount of such

damages is presently unknown at this time and will be calculated after discovery for proof at trial.

## V.   MARKET DEFINITION

101.   The relevant geographic market for purposes of this action is the United States and its territories.

102.   The relevant product markets are: (1) the market for CDMA and premium LTE modem chipsets ("Modem Chipset Market"), which allow cellular devices to communicate with carrier networks, and (2) intellectual property rights associated with SEPs ("SEP Licensing Market").  These two products will be referred to collectively as the "Cellular Device Components."

103.   Qualcomm directly participates in the market for the sale of cellular devices to Plaintiffs and Class Members by encumbering cellular devices through its licenses (and related excessive royalties).  Specifically, Qualcomm's royalty payments are calculated as a percentage of the wholesale price of the cellular devices, which in turn increase the retail price of those devices.

104.   Plaintiffs purchase the Cellular Device Components inclusive in a cellular device.  Plaintiffs' injuries are inextricably intertwined with Qualcomm's anticompetitive conduct with respect to chipset modems and abuse of patent rights because Qualcomm has increased the cost of buying cellular devices by, among other things, (1) eliminating competition, allowing Qualcomm to charge supracompetitive prices for its chipsets and licenses; and (2) forcing device manufacturers to agree to onerous licensing terms, including excessive royalties.

## CLASS ACTION ALLEGATIONS

105.   Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on their own behalf and as representatives, seeking injunctive relief under the Sherman Act and equitable, injunctive relief and monetary relief under California law on behalf of the following class (the "Nationwide Class"):

- 23 -

All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

106. In the alternative to the claim for nationwide monetary relief under California law, Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief pursuant to the common law of unjust enrichment and individual state antitrust, unfair competition, and consumer protection laws for each of the states listed below (the "Indirect Purchaser States") on behalf of the following classes (the "Indirect Purchaser Classes"):

a. **Alabama**: All persons and entities in Alabama who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Alabama Indirect Purchaser Class"). This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

b. **Arizona**: All persons and entities in Arizona who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Arizona

- 24 -

Indirect Purchaser Class"). This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

c. **Arkansas**: All persons and entities in Arkansas who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Arkansas Indirect Purchaser Class"). This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

d. **California**: All persons and entities in California who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "California Indirect Purchaser Class"). This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

CLASS ACTION COMPLAINT

e.    **District of Columbia**:  All persons and entities in the District of Columbia who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "District of Columbia Indirect Purchaser Class").  This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

f.    **Hawaii**:  All persons and entities in Hawaii who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Hawaii Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

g.    **Iowa**:  All persons and entities in Iowa who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Iowa Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from

Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

h.     **Kansas**:  All persons and entities in Kansas who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Kansas Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

i.     **Maine**:  All persons and entities in Maine who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Maine Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

j.     **Massachusetts**:  All persons and entities in Massachusetts who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Massachusetts Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) a all federal governmental entities and instrumentalities of the federal government, states

and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

k.   **Michigan**:  All persons and entities in Michigan who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Michigan Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

l.   **Minnesota**:  All persons and entities in Minnesota who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Minnesota Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

m.   **Mississippi**:  All persons and entities in Mississippi who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Mississippi Indirect Purchaser Class").  This class excludes:  (a) Defendant, its

officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

n.    **Nebraska**:  All persons and entities in Nebraska who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Nebraska Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

o.    **Nevada**:  All persons and entities in Nevada who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Nevada Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

p.    **New Hampshire**:  All persons and entities in New Hampshire who purchased, paid and/or provided reimbursement for some or all of the purchase

price for Relevant Cellular Devices from January 17, 2013 through the present (the "New Hampshire Indirect Purchaser Class"). This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

q.      **New Mexico**: All persons and entities in New Mexico who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "New Mexico Indirect Purchaser Class"). This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

r.      **New York**: All persons and entities in New York who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "New York Indirect Purchaser Class"). This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

CLASS ACTION COMPLAINT

s.   **North Carolina**:  All persons and entities in North Carolina who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "North Carolina Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

t.   **North Dakota**:  All persons and entities in North Dakota who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "North Dakota Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

u.   **Oregon**:  All persons and entities in Oregon who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Oregon Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from

- 31 -

Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

v.    **South Dakota**:  All persons and entities in South Dakota who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "South Dakota Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

w.    **Tennessee**:  All persons and entities in Tennessee who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Tennessee Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

x.    **Vermont**:  All persons and entities in Vermont who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Vermont Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states

- 32 -

and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

y. **West Virginia**:  All persons and entities in West Virginia who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "West Virginia Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

z. **Wisconsin**:  All persons and entities in Wisconsin who purchased, paid and/or provided reimbursement for some or all of the purchase price for Relevant Cellular Devices from January 17, 2013 through the present (the "Wisconsin Indirect Purchaser Class").  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

107.  Plaintiffs believe that there are at least hundreds of thousands if not millions of members in each of the above Classes, their exact number and identities being known or knowable from records in Defendant's possession, custody, or

control.  The members of the Classes are so numerous and geographically dispersed that joinder of all members is impracticable.

108.   Plaintiffs' claims are typical of the claims of the members of each of the Classes.

109.   Plaintiffs and the members of the Classes have all sustained damages because they purchased Relevant Cellular Devices during the Class Period at prices that were artificially inflated by Qualcomm's monopolistic conduct and non-FRAND royalty licensing.

110.   Defendant's monopolistic and anti-competitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiffs and the other members of the Classes.

111.   Plaintiffs will fairly and adequately protect the interests of the members of each of the Classes they seek to represent and are represented by counsel competent and experienced in class action and antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the other members of the Classes.

112.   Common questions of law and fact exist as to all members of each of the Classes and predominate over any questions affecting solely individual members of the Classes.

113.   The questions of law and fact common to the Classes include, but are not limited to:

a.      Whether Qualcomm possessed monopoly power over the Cellular Device Components in the United States during the Class Period;

b.      Whether Qualcomm willfully acquired or maintained monopoly power over the Cellular Device Components in the United States during the Class Period;

c.       Whether Qualcomm possessed monopoly power in the Modem Chipset Market (underlying the Cellular Device Components) in the United States during the Class Period;

d.       Whether Qualcomm attempted to possess monopoly power in the modem chipset market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

e.       Whether Qualcomm possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

f.       Whether Qualcomm attempted to possess monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

g.       Whether Qualcomm tied the sale of its CDMA-based and premium LTE-based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

h.       Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs, for example in requiring purchases of "portfolios" of patents;

i.       Whether Qualcomm's acquisition and maintenance of its monopoly in the Cellular Device Components violated the Sherman Act, as alleged in the First Claim for Relief;

j.       Whether Qualcomm's acquisition and maintenance of its monopoly in the power in the Modem Chipset Market violated the Sherman Act, as alleged in the First Claim for Relief;

k.       Whether Qualcomm's acquisition and maintenance of its monopoly in the SEP Licensing Market (for licenses critical to the technology underlying cellular device market) violated the Sherman Act, as alleged in the First Claim for Relief;

CLASS ACTION COMPLAINT

l.      Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq*., as alleged in the Second Claim for Relief;

m.      Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second, Third, and Fifth Claims for Relief;

n.      Whether Qualcomm unjustly enriched itself to the detriment of Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Sixth Claim for Relief.

o.      Whether the conduct of Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

p.      The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

q.      The appropriate injunctive and related equitable relief for the Classes; and

r.      The appropriate class-wide measure of damages for the Indirect Purchaser Classes.

114.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the Classes are readily definable and prosecution of this lawsuit as a class action will eliminate the possibility of repetitive litigation.  Treatment as a class action will permit a large number of similarly situated entities to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This action presents no difficulties in management that would preclude its maintenance as a class action.

- 36 -

115.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.  The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the courts and the parties, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes, and would establish incompatible standards of conduct for Defendants.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

116.   Plaintiffs incorporate by reference the allegations set forth above.

117.   Beginning at least as early as January 17, 2013, and continuing thereafter through the present, Qualcomm monopolized the market for CDMA and LTE modem chipsets.  From 2008 through 2014, Qualcomm controlled over 90% of the CDMA modem chipset market, and in 2015, Qualcomm still controlled well over 80% of the CDMA modem chipset market.  Further, Qualcomm currently controls 69% of the LTE modem chipset market and controlled as much as 96% of the market during the class period.  And moreover, Qualcomm is the dominant supplier of CDMA-LTE chipsets that are backward compatible with CDMA, which are used in most LTE-compatible smartphones so that they are compatible with both standards.

118.   Qualcomm's market power is evident in its ability to force the world's largest OEMs – including Apple – to accept patent licensing terms that they deem grossly unfair and unreasonable in order to avoid losing access to Qualcomm's mobile chipset supply.

119.   As alleged herein, from January 17, 2013 through the present, Qualcomm, by and through its officers, directors, employees, agents and/or other representatives, engaged in anticompetitive exclusionary conduct, as set forth

above, that was intended to and had the effect of illegally establishing and maintaining Qualcomm's monopoly in the mobile chipset market, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

120.    Qualcomm has effectively excluded competition from a substantial portion of the modem chipset market, has used its market dominance to prevent other manufacturers from competing with it, and has profited from its anticompetitive conduct by using its monopoly power in the modem chipset market in order to extract exorbitantly high patent license royalties and unreasonable licensing terms in violation of its FRAND commitments.

121.    There is no legitimate business justification for Qualcomm's anticompetitive actions and conduct through which it has expanded and maintained its monopoly power in the markets for modem chipsets and for certain types of SEPs used in smartphones.  The anticompetitive effects of Qualcomm's conduct far outweigh any conceivable pro-competitive benefit or justification.  Even if such justification existed, any possible pro-competitive benefits could have been obtained by less restrictive alternatives.

122.    As a direct and proximate result of Qualcomm's anticompetitive conduct, Plaintiffs and members of the proposed Classes have been injured in their business and property.  Plaintiffs and the other members of the proposed Classes have paid higher, artificially inflated prices for cellular devices than they otherwise would have paid in the absence of Qualcomm's conduct by inflating the costs of producing the smartphones, which costs are passed on to end purchasers.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Qualcomm's conduct unlawful.

123.    Accordingly, Plaintiffs and other members of the proposed Classes seek injunctive relief, and costs of suit, including attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**Nationwide Claim for Violation of the Cartwright Act,**
**Cal. Bus. & Prof. Code §§ 16700, *et seq.***

124.   Plaintiffs incorporate by reference the allegations set forth above.

125.   During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of Cal. Bus & Prof. Code §§ 16700, *et seq.*  While section 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement, which is what occurred here.  Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

126.   Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive means, including by excluding competition.

127.   The Relevant Cellular Devices are commodities.

128.   It is appropriate to apply California antitrust law to the Nationwide Class.  Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as its direct customers that reside in California, to its unlawful conduct.  In doing so, Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from companies doing business in California.  Additionally, California is the most populous state in the country, and therefore it was foreseeable that a substantial number of California consumers would be impacted by Qualcomm's unlawful behavior.

129.   As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

**THIRD CLAIM FOR RELIEF**
**Nationwide Claim for Violation of Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

130.    Plaintiffs incorporate by reference the allegations set forth above.

131.    Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which protects consumers from illegal, fraudulent and unfair business practices.

132.    Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

133.    As discussed above, Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act.  As such, Qualcomm's acts constitute unlawful conduct under section 17200.  Qualcomm unlawfully acquired and maintained its monopoly over the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio on non-FRAND terms.

134.    Qualcomm's conduct was deceptive because it induced SSOs to use its technology on the promise it would comply with FRAND.  But after SSOs selected Qualcomm's technology for their standards, Qualcomm refused to comply with its FRAND promises.

135.    Qualcomm's conduct is unfair to Plaintiffs and members of the class because as a direct result of its acts described above, Plaintiffs were charged more for their Relevant Cellular Devices than they would have been but for Qualcomm's conduct.

136.    Qualcomm's business acts and practices were centered in, carried out, effectuated and perfected mainly within the State of California, and Qualcomm's conduct within California injured all Class members throughout the United States.

Therefore, this claim for relief under California law is brought on behalf of all Class members, whether or not they are California residents.

137.   Qualcomm's unlawful, deceptive and unfair business practices have caused and continue to cause Plaintiffs and the Class members to pay supracompetitive and artificially-inflated prices for Relevant Cellular Devices. Plaintiffs and the Class members suffered injury in fact and lost money or property as a result of the unfair competition.

138.   As alleged in this Complaint, Qualcomm has been unjustly enriched as a result of its wrongful conduct and by its unfair competition. Plaintiff and Class members are accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits obtained by Qualcomm as a result of such business practices, pursuant to California Business and Professions Code §§ 17203 and 17204.

139.   In addition, pursuant to California Business & Professions Code § 17204, Plaintiffs and the Nationwide Class seek an order of this Court enjoining Qualcomm from continuing to engage in the acts as set forth in this Complaint, which acts constitute violations of California Business & Professions Code §§ 17200, *et seq.*  Plaintiffs, the Class and the public will be irreparably harmed if such an order is not granted.

## FOURTH CLAIM FOR RELIEF
### Violations of State Antitrust and Restraint of Trade Laws

140.   Plaintiffs incorporate by reference the allegations of set forth above.

141.   In the event that the Court does not apply California law on a nationwide basis, Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the alternative:

142.   **Alabama**:  By reason of the conduct alleged herein, Qualcomm has violated Ala. Code § 6-5-60(a), *et seq.*

143.   A substantial part of Qualcomm's anticompetitive conduct occurred within Alabama.

144.   Qualcomm monopolized a substantial part of trade or commerce within Alabama.

145.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Alabama Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

146.   By reason of the foregoing, the Alabama Indirect Purchaser Class is entitled to seek all forms of relief available under Ala. Code § 6-5-60(a), *et seq.*

147.   **Arizona**:  By reason of the conduct alleged herein, Qualcomm has violated Arizona Rev. Stat. §§ 44-1401, *et seq*.

148.   Qualcomm established, attempted to establish, maintained, or used a monopoly of trade or commerce in the market for Cellular Device Components for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the market for Cellular Device Components, a substantial part of which occurred in Arizona.

149.   Qualcomm's violations of Arizona law were flagrant.

150.   Qualcomm's unlawful conduct substantially affected Arizona's trade and commerce.

151.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Arizona Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

152.   By reason of the foregoing, the Arizona Indirect Purchaser Class is entitled to seek all forms of relief available under Arizona Revised Stat. §§ 44-1401, *et seq*.

153. **California**:  By reason of the conduct alleged herein, and as elaborated further in the Second Claim for Relief, *supra*, Qualcomm has violated California Bus. & Prof. Code §§ 16700, *et seq*.

154.   As a direct and proximate result of Qualcomm's unlawful conduct, members of the California Indirect Purchaser Class have been injured by paying supracompetitive prices for Relevant Cellular Devices.  As a result of Qualcomm's violations of §§ 16700, *et seq.*, the California Indirect Purchaser Class seeks treble damages and the costs of suit, including reasonable attorneys' fees.

155. **District of Columbia**:  By reason of the conduct alleged herein, Qualcomm has violated District of Columbia Code Ann. §§ 28-4501, *et seq*.

156.   Qualcomm has monopolized or attempted to monopolize a substantial part of trade or commerce within the District of Columbia.

157.   Qualcomm's unlawful conduct substantially affected the District of Columbia's trade and commerce.

158.   As a direct and proximate result of Qualcomm's unlawful conduct, members of the District of Columbia Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

159.   By reason of the foregoing, the District of Columbia Indirect Purchaser Class is entitled to seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

160. **Iowa**:  By reason of the conduct alleged herein, Qualcomm has violated Iowa Code §§ 553.1, *et seq*.

161.   Qualcomm established, attempted to establish, maintained, or used a monopoly of trade or commerce in the market for Cellular Device Components for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the market for Cellular Device Components, a substantial part of which occurred in Iowa.

162.   Qualcomm's unlawful conduct substantially affected Iowa trade and commerce.

163.   Qualcomm's conduct was willful or flagrant.

164.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Iowa Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

165.   By reason of the foregoing, the Iowa Indirect Purchaser Class is entitled to seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

166.   **Kansas**:  By reason of the conduct alleged herein, Qualcomm has violated Kansas Stat. Ann. §§ 50-101, *et seq.*

167.   Qualcomm's monopolization of the Modem Chipset Market and SEP Licensing Market and anticompetitive conduct constitutes unlawful agreement in restraint of trade restraint of trade.

168.   As a direct and proximate result of Qualcomm's unlawful conduct, members of the Kansas Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

169.   By reason of the foregoing, the Kansas Indirect Purchaser Class is entitled to seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

170.   **Maine**:  By reason of the conduct alleged herein, Qualcomm has violated Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*

171.   Qualcomm has Keurig attempted to monopolize or monopolized trade or commerce in the market for Cellular Device Components for the purpose of excluding competition, a substantial part of which occurred within Maine.

172.   Qualcomm's unlawful conduct substantially affected Maine's trade and commerce.

173.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Maine Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

174.   By reason of the foregoing, the Maine Indirect Purchaser Class is entitled to seek all forms of relief available under Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

175.   **Michigan**:  By reason of the conduct alleged herein, Qualcomm has violated Michigan Comp. Laws. Ann. §§ 445.771, *et seq*.

176.   Qualcomm established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Cellular Device Components, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Michigan.

177.   Qualcomm's unlawful conduct substantially affected Michigan's trade and commerce.

178.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Michigan Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

179.   By reason of the foregoing, the Michigan Indirect Purchaser Class is entitled to seek all forms of relief available under Michigan Comp. Laws. Ann. §§ 445.771, *et seq*.

180.   **Minnesota**:  By reason of the conduct alleged herein, Qualcomm has violated Minnesota Stat. §§ 325D.49, *et seq*.

181.   Qualcomm established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Cellular Device Components, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Minnesota.

182.   Qualcomm's unlawful conduct substantially affected Minnesota's trade and commerce.

183.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Minnesota Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

184.   By reason of the foregoing, the Minnesota Indirect Purchaser Class is entitled to seek all forms of relief available under Minnesota Stat. §§ 325D.49, *et seq.*

185.   **Mississippi**:  By reason of the conduct alleged herein, Qualcomm has violated Mississippi Code Ann. § 75-21-1, *et seq.*

186.   Qualcomm's monopolization or attempted monopolization of the market for Cellular Device Components, restrained trade, increased prices of modem chipsets, SEPs, and hindered competition.

187.   Qualcomm's unlawful conduct substantially affected Mississippi's trade and commerce.

188.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Mississippi Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

189.   By reason of the foregoing, the Mississippi Indirect Purchaser Class is entitled to seek all forms of relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

190.   **Nebraska**:  By reason of the conduct alleged herein, Qualcomm has violated Nebraska Rev. Stat. §§ 59-801, *et seq.*

191.   Qualcomm established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Cellular Device Components, a substantial part of which occurred within Nebraska.

192.   Qualcomm used its monopoly power to artificially inflate the prices its customers – OEMs – paid for its SEPs.  These costs were passed on to members of the Nebraska Indirect Purchaser Class, which had the effect of increasing the prices they paid.

193.   Qualcomm's unlawful conduct substantially affected Nebraska's trade and commerce.

194.   As direct and proximate cause of Qualcomm's unlawful conduct, the members of the Nebraska Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

195.   By reason of the foregoing, the Nebraska Indirect Purchaser Class is entitled to seek all forms of relief available under Nebraska Rev. Stat. §§ 59-801, *et seq*.

196.   **Nevada**:  By reason of the conduct alleged herein, Qualcomm has violated Nevada Rev. Stat. Ann. §§ 598A.010, *et seq*.

197.   Qualcomm established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Cellular Device Components, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within Nevada.

198.   Qualcomm entered contracts in which it conditioned the sale of its modem chipsets on the licensing of Qualcomm's SEPs on non-FRAND terms.

199.   Qualcomm's unlawful conduct substantially affected Nevada's trade and commerce.

200.   As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the Nevada Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

201.   By reason of the foregoing, the Nevada Indirect Purchaser Class is entitled to seek all forms of relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq*.

202.   **New Hampshire**:  By reason of the conduct alleged herein, Qualcomm has violated New Hampshire Rev. Stat. §§ 356:1, *et seq*.

203.   Qualcomm has established, maintained, or used monopoly power, or attempted to establish monopoly power over trade or commerce in the market for Cellular Device Components, a substantial part of which occurred within New Hampshire, for the purpose of affecting competition or controlling, fixing, or maintaining prices for its SEPs.

204.   Qualcomm's violations of New Hampshire law were knowing and willful.

205.   Qualcomm's conduct substantially affected New Hampshire's trade and commerce.

206.   As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the New Hampshire Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

207.   By reason of the foregoing, the New Hampshire Indirect Purchaser Class is entitled to seek all forms of relief available under New Hampshire Rev. Stat. §§ 356:1, *et seq*.

208.   **New Mexico**:  By reason of the conduct alleged herein, Qualcomm has violated New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

209.   Qualcomm established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Cellular Device Components, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within New Mexico.

210.   Qualcomm's unlawful conduct substantially affected New Mexico's trade and commerce.

211.   As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the New Mexico Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

212.   By reason of the foregoing, the New Mexico Indirect Purchaser Class is entitled to seek all forms of relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

213.   **New York**:  By reason of the conduct alleged herein, Qualcomm has violated New York Gen. Bus. Law §§ 340, *et seq.*

214.   Qualcomm established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Cellular Device Components, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within New York.

215.   Qualcomm entered into a contract, agreement, arrangement, or combination whereby (a) monopolies in the market for Cellular Device Components were established or maintained; (b) competition or the free exercise of conduct in the market for Cellular Device Components was restrained; and/or (c) competition was restrained for the purpose of establishing or maintaining a monopoly or unlawfully interfering with the free exercise of conduct in the market for Cellular Device Components.

216.   Qualcomm's unlawful conduct substantially affected New York's trade and commerce.

217.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the New York Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

218.   By reason of the foregoing, the New York Indirect Purchaser Class is entitled to seek all forms of relief available under New York Gen. Bus. Law §§ 340, *et seq.*

219.   **North Carolina**:  By reason of the conduct alleged herein, Qualcomm has violated North Carolina Gen. Stat. §§ 75-1, *et seq.*

220.   Qualcomm monopolized a substantial part of trade or commerce within North Carolina, and a substantial part of Qualcomm's anticompetitive conduct occurred within North Carolina.

221.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the North Carolina Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

222.   By reason of the foregoing, the North Carolina Indirect Purchaser Class is entitled to seek all forms of relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

223.   **North Dakota**:  By reason of the conduct alleged herein, Qualcomm has violated North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

224.   Qualcomm monopolized a substantial part of trade or commerce within North Dakota, and a substantial part of Qualcomm's anticompetitive conduct occurred within North Dakota.

225.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the North Dakota Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

226.   By reason of the foregoing, the North Dakota Indirect Purchaser Class is entitled to seek all forms of relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

227.   **Oregon**:  By reason of the conduct alleged herein, Qualcomm has violated Oregon Rev. Stat. §§ 646.705, *et seq.*

228.   Qualcomm monopolized a substantial part of trade or commerce within Oregon, and a substantial part of Qualcomm's anticompetitive conduct occurred within Oregon.

229.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Oregon Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

230.   By reason of the foregoing, the Oregon Indirect Purchaser Class is entitled to seek all forms of relief available under Oregon Rev. Stat. §§ 646.705, *et seq.*

231.   **South Dakota**:  By reason of the conduct alleged herein, Qualcomm has violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

232.   Qualcomm monopolized a substantial part of trade or commerce within South Dakota, and a substantial part of Qualcomm's anticompetitive conduct occurred within South Dakota.

233.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the South Dakota Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

234.   By reason of the foregoing, the South Dakota Indirect Purchaser Class is entitled to seek all forms of relief available under South Dakota Codified Laws §§ 37-1, *et seq.*

235.   **Tennessee**:  By reason of the conduct alleged herein, Qualcomm has violated Tennessee Code Ann. §§ 47-25-101, *et seq.*

236.    Qualcomm monopolized a substantial part of trade or commerce within Tennessee, and a substantial part of Qualcomm's anticompetitive conduct occurred within Tennessee.

237.    As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Tennessee Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

238.    By reason of the foregoing, the Tennessee Indirect Purchaser Class is entitled to seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

239.    **Utah**:  By reason of the conduct alleged herein, Qualcomm has violated Utah Code Ann. §§ 76-10-911, *et seq.*

240.    Qualcomm monopolized a substantial part of trade or commerce within Utah, and a substantial part of Qualcomm's anticompetitive conduct occurred within Utah.

241.    As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Utah Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

242.    By reason of the foregoing, the Utah Indirect Purchaser Class is entitled to seek all forms of relief available under Utah Code Ann. §§ 76-10-911, *et seq.*

243.    **Vermont**:  By reason of the conduct alleged herein, Qualcomm has violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

244.    Qualcomm monopolized a substantial part of trade or commerce within Vermont, and a substantial part of Qualcomm's anticompetitive conduct occurred within Vermont.

CLASS ACTION COMPLAINT

245.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Vermont Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

246.   By reason of the foregoing, the Vermont Indirect Purchaser Class is entitled to seek all forms of relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

247.   **West Virginia**:  By reason of the conduct alleged herein, Qualcomm has violated West Virginia Code §§ 47-18-1, *et seq.*

248.   Qualcomm established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Cellular Device Components, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for Cellular Device Components.

249.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the West Virginia Indirect Purchaser Class have been caused to pay supracompetitive prices for Relevant Cellular Devices, injuring them and threatening them with further injury.

250.   By reason of the foregoing, the West Virginia Indirect Purchaser Class is entitled to seek all forms of relief available under West Virginia Code §§ 47-18-1, *et seq.*

251.   **Wisconsin**:  By reason of the conduct alleged herein, Qualcomm has violated Wisconsin Stat. §§ 133.01, *et seq.*

252.   Qualcomm monopolized a substantial part of trade or commerce within Wisconsin, and a substantial part of Qualcomm's anticompetitive conduct occurred within Wisconsin.

253.   As a direct and proximate result of Qualcomm's unlawful conduct, the members of the Wisconsin Indirect Purchaser Class have been injured in their business or property and are threatened with further injury.

254.   By reason of the foregoing, the Wisconsin Indirect Purchaser Class is entitled to seek all forms of relief available under Wisconsin Stat. §§ 133.01, *et seq*.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**Violations of State Consumer Protection Statutes**

255.   Plaintiffs incorporate by reference the allegations set forth above.

256.   In the event that the Court does not apply California law on a nationwide basis, Plaintiffs allege the following violations of state consumer protection statutes in the alternative:

257.   **<u>Arkansas</u>**:  During the Class Period, in Arkansas, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

258.   During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of the Arkansas Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in Arkansas.

259.   The aforementioned conduct constitutes unconscionable, false, or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

260.   Qualcomm's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Arkansas Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

261.   Accordingly, members of the Arkansas Indirect Purchaser Class seek actual damages and attorney's fees pursuant to Ark. Code Ann. § 4-88-113(f).

262.   **California**:  By reason of the conduct alleged herein, and as elaborated further in the Third Claim for Relief, *supra*, Qualcomm has violated California Bus. & Prof. Code §§ 17200, *et seq*.

263.   As a direct and proximate result of Qualcomm's unlawful conduct, members of the California Indirect Purchaser Class have been injured by paying more for Relevant Cellular Devices than they otherwise would have paid.  As a result of Qualcomm's violations of §§ 17200 *et seq*., the California Indirect Purchaser Class seeks restitution pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5, as this action was brought to enforce an important right affecting the public interest for a large class of persons, the necessity and financial burden of private enforcement are such as to make the award appropriate, and such fees should not in the interest of justice be paid out of the recovery, if any.

264.   **District of Columbia**:  During the Class Period, in the District of Columbia, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

265.   During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of the District of Columbia Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in the District of Columbia.

266.   The aforementioned conduct constitutes unfair methods of competition or unfair or unfair, unconscionable, or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to District of Columbia Code Ann. §§ 28-3901, *et seq*.

267.   Qualcomm's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the District of Columbia Indirect Purchaser Class to pay supracompetitive prices for Relevant Cellular Devices, injuring them in their business or property.

268.   Accordingly, members of the District of Columbia Indirect Purchaser Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-3901, *et seq*.

269.   **<u>Florida</u>**:  During the Class Period, in Florida, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

270.   During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of Florida Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in the Florida.

271.   The aforementioned conduct constitutes unfair methods of competition or unfair, unconscionable, or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

272.   Qualcomm's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Florida Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

273.   Accordingly, members of the Florida Indirect Purchaser Class seek all forms of relief available under Fla. Stat. §§ 501.201, *et seq*.

274.   **<u>Massachusetts</u>**:  During the Class Period, in Massachusetts, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

275.   During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of the Massachusetts Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in Massachusetts.

276. The aforementioned conduct constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to Mass. Gen. Laws 93A § 2(a).

277. Qualcomm's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Massachusetts Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

278. Accordingly, members of the Massachusetts Indirect Purchaser Class seek up to treble damages, attorney's fees, and costs pursuant to Mass. Gen. Laws 93A § 9(3) and (4).

279. **Missouri**: During the Class Period, in Missouri, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

280. During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of Missouri Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in the Missouri.

281. The aforementioned conduct constitutes unfair methods of competition or unfair, unconscionable, or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq*.

282. Qualcomm's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Missouri Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

283. Accordingly, members of the Missouri Indirect Purchaser Class seek all forms of relief available under Mo. Rev. Stat. §§ 407.010, *et seq*.

284.   **Nebraska**:  During the Class Period, in Nebraska, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

285.   During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of the Nebraska Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in Nebraska.

286.   The aforementioned conduct constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to Neb. Rev. Stat. §§ 59-1601, *et seq*.

287.   Qualcomm's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Nebraska Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

288.   Accordingly, members of the Nebraska Indirect Purchaser Class seek actual damages, costs of suit, attorney's fees, and any other award of damages authorized by Neb. Rev. St. § 59-1609.

289.   **New Mexico**:  During the Class Period, in New Mexico, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

290.   During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of New Mexico Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in the New Mexico.

291.   The aforementioned conduct constitutes unconscionable trade practices because the conduct results in a gross disparity between the value received by consumers and the price paid, in violation of N. M. Stat. Ann. §§ 57-12-2(E)(2) and 57-12-3.

292.    Qualcomm's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the New Mexico Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

293.    Accordingly, members of the New Mexico Indirect Purchaser Class seek the greater of $100 each or actual damages, the greater of $300 each or treble damages, attorney's fees, and costs pursuant to N.M. Stat. Ann. § 57-12-10(B), (C), and (E).

294.    **New York**:  During the Class Period, in New York, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

295.    During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of the New York Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in New York, and took efforts to conceal their agreements from Plaintiffs and the New York Indirect Purchaser Class.  Defendant made public statements about the prices of Relevant Cellular Devices that omitted material information that rendered the statements that they made materially misleading; and Defendant alone possessed material information that was relevant to consumers, but failed to provide the information.  Because of Defendant's unlawful trade practices in the State of New York, New York Indirect Purchasers who indirectly purchased Relevant Cellular Devices were misled to believe that they were paying a fair price for Relevant Cellular Devices or the price increases for Relevant Cellular Devices were for valid business reasons; and similarly situated consumers were potentially affected by Defendant's conduct.  Defendant knew that their unlawful trade practices with respect to pricing Relevant Cellular Devices would have an impact on New York consumers and not just the Defendant's direct customers.  Defendant knew that their unlawful trade practices

- 59 -

with respect to pricing Relevant Cellular Devices would have a broad impact, causing class members who indirectly purchased Relevant Cellular Devices to be injured by paying more for Relevant Cellular Devices than they would have paid in the absence of Defendant's unlawful trade acts and practices.

296.    The aforementioned conduct constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

297.    Qualcomm's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the New York Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

298.    Accordingly, members of the New York Indirect Purchaser Class seek all forms of relief available under N.Y. Gen. Bus. Law § 349 (h).

299.    **North Carolina**:  During the Class Period, in North Carolina, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

300.    During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of the North Carolina Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in North Carolina.

301.    The aforementioned conduct constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to N.C.G.S.A. §§ 75-1.1, *et seq*.

302.    Qualcomm's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the North

Carolina Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

303.   Accordingly, members of the North Carolina Indirect Purchaser Class seek damages and treble damages pursuant to N.C.G.S.A. § 75-16.

304.   **Rhode Island**:  During the Class Period, in Rhode Island, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

305.   During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of the Rhode Island Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in Rhode Island.

306.   The aforementioned conduct constitutes unfair methods of competition or unfair, unconscionable, or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

307.   Qualcomm's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Rhode Island Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

308.   Accordingly, members of the Rhode Island Indirect Purchaser Class seek all forms of relief available under R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

309.   **Vermont**:  During the Class Period, in Vermont, Qualcomm knowingly engaged in anticompetitive conduct, including monopolizing the market for Cellular Device Components.

310.   During the Class Period, Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices to members of the Vermont Indirect Purchaser Class, thus substantially affecting competition, commerce, and consumers in Vermont.

311.   The aforementioned conduct constitutes unfair methods of competition or unfair, unconscionable, or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to Vermont Stat. Ann. 9 §§ 2451, *et seq.*

312.   Qualcomm's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Vermont Indirect Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

313.   Accordingly, members of the Vermont Indirect Purchaser Class seek all forms of relief available under Vermont Stat. Ann. 9 §§ 2451, *et seq.*

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment

314.   Plaintiffs incorporate by reference the allegations set forth above.

315.   As a result of its unlawful conduct described above, Defendant Qualcomm has and will continue to be unjustly enriched. Defendant has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits related to the Relevant Cellular Devices.

316.   Defendant has benefited from its unlawful acts and it would be inequitable for it to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices and the overpayments made by Plaintiffs and members of the Indirect Purchaser Classes for Relevant Cellular Devices during the Class Period.

317.   Plaintiffs and members of the Indirect Purchaser Classes are entitled to the amount of Defendant's ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and members of the Indirect Purchaser Classes are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Indirect Purchaser Classes may make claims on a *pro rata* basis.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes respectfully request the following relief:

A.      That the Court determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.      That the Court certify the Classes defined in this Complaint pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and (b)(3), and designate Plaintiffs as the representatives for the Classes and its counsel as Lead Counsel for the Classes;

C.      That the unlawful conduct alleged herein constituted a violation of Section 2 of the Sherman Act, and the state antitrust and consumer protection laws set forth herein;

D.      That judgment be entered for Plaintiffs and members of the Classes against Defendant for three times the amount of damages sustained by them as allowed by law, and for damages under state antitrust and consumer protections statutes as allowed by law;

E.      That Plaintiffs and the Classes recover pre-judgment and post-judgment interest as permitted by law;

F.      That Plaintiffs and the Classes recover the costs of this suit, including attorneys' fees, as provided by law;

G.      That Defendant be enjoined from continuing their unlawful acts described herein; and

H.      That Plaintiffs and the Classes be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court under the circumstances.

1

**JURY TRIAL DEMANDED**

2

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal

3

Rules of Civil Procedure, of all issues so triable.

4

Dated:  January 27, 2017       **KAPLAN FOX & KILSHEIMER LLP**

5

By:      /s/ *Laurence D. King*
                         Laurence D. King

6

7

Laurence D. King (SBN 206423)
lking@kaplanfox.com
Linda M. Fong (SBN 124232)

8

lfong@kaplanfox.com
Mario M. Choi (SBN 243409)

9

mchoi@kaplanfox.com
350 Sansome Street, Suite 400

10

San Francisco, California 94104
Telephone: (415) 772-4700

11

Facsimile:  (415) 772-4707

12

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (to be admitted *pro hac vice*)

13

rkaplan@kaplanfox.com
Frederic S. Fox (to be admitted *pro hac vice*)

14

ffox@kaplanfox.com
Donald R. Hall (to be admitted *pro hac vice*)

15

dhall@kaplanfox.com
Joshua H. Saltzman (to be admitted *pro hac vice*)

16

jsaltzman@kaplanfox.com
850 Third Avenue, 14th Floor

17

New York, NY  10022
Telephone:  (212) 687-1980

18

Facsimile:   (212) 687-7714

19

**WITES & KAPETAN, P.A.**
Marc A. Wites (to be admitted *pro hac vice*)

20

mwites@wklawyers.com
4400 North Federal Highway

21

Lighthouse Point, FL  33064
Telephone: (954) 570-8989

22

Facsimile: (954) 354-0205

23

*Attorneys for Plaintiffs*

24

25

26

27

28